# IN RE DISBARMENT OF DAVID LUNDEEN.[1]

September 10, 1937.

No. 29,464.

*Oscar G. Haugland,* for State Board of Law Examiners.
*Lewis E. Lohmann* and *Z. L. Begin,* for respondent.

PER CURIAM.

The original accusation of misconduct against Mr. Lundeen was dated January 26, 1933. Later further complaints were made against him, and as a consequence there have followed three supplemental accusations. All of these were duly met by appropriate answers. This court appointed the Honorable Charles P. Hall, one of the judges of the first judicial district, as referee. Exhaustive findings have been made. Transcripts of the testimony taken at the various hearings have been duly certified and filed. Counsel have adequately briefed the issues.

In all there are ten charges upon which the court made findings. Some of these are, compared with others, rather trivial. In behalf of the state board of law examiners it is urged that the most serious, the one which in the opinion of the board requires disbarment, is that which is referred to in the evidence and findings as the Nelson

[1]Reported in 274 N. W. 825.

matter. In reviewing the issues presented and to be determined we shall confine ourselves largely thereto. Generally speaking, the facts forming the background thereof are without substantial dispute, the only issue being whether there was in fact a *misappropriation* by Mr. Lundeen of the money there involved or, as contended by him, a mere matter of *bad judgment*. Necessarily this requires a rather extensive statement of facts.

During the summer of 1926 one Mary Nelson of Vermillion, South Dakota, came into possession of some $2,000 by reason of payment to her of the proceeds of policies upon the life of her husband, who had recently died. This money she had placed on deposit in a Vermillion bank. It seems that banks in that locality were then distrusted. She became disturbed about the safety of this money, representing as it did a very substantial part of her means. Because of her state of mind, she discussed this matter with a brother of respondent (referred to in the record as Joel), who suggested that respondent be engaged to make safe investment of this fund for her. After conferring together about the matter, Mr. Lundeen wrote Mrs. Nelson a letter dated August 2, 1926, as follows:

"Mrs. Mary L. Nelson,

"206 Willow St.,

"Vermillion, South Dakota.

"Dear Mrs. Nelson:

"Joel has written me about the money you have to invest and about the offer of the agent for the Minnesota Mutual Company. I think you will find that the offer of the agent amount to selling you some sort of policy whereby you get about 8% on your money but that you cannot get your principal back. I may be mistaken about that but insurance as a rule are not allowed to borrow money.

"I wrote Joe that there is plenty of opportunity of investing money in Minneapolis that would be entirely safe and on which you would have a good return. You might do one of many things. If you put the money in a bank—one of our large ones your return would of course be small—about 3½% but your money would be always available and Minneapolis as you may not know has the largest

bank west of Chicago. *If you put it in a first mortgage which is equally sage [safe] your return might be from 5½ to 6%. On second mortgages you might get 7% or 8%. On good safe contracts for deed you might even get as high as a net return of 10% and with no chance of loss. We have handled matters of this kind for some of our clients and if you wish us to you can send the money to me and we will see to it that it is put where you will be in no danger of loss to you and were [where] you will get a good return.*

"My advise [advice] to you would be that you do not keep your money in a small bank for when they close you are just about out of your money and they are closing to often for comfort now days. I notice that the First State of Beresford closed the other day. I have not all the facts about what the insurance man offered you but it does not sound good to me. In fact I have talked with Mr. Williams manager of the company in this city and he says the company does not borrow money and certainly would never pay 8% for any money if they did borrow. The agent is either trying to get the money for himself or selling you some form of insurance where your money will be beyond your reach.

"*If we can be of any service to you we will appreciate your business and do everything for you we can.* [Italics supplied.]

"Very respectfully yours,
"Lundeen & Lundeen
"By David Lundeen"

This letter (petitioner's exhibit N-1) was written upon a letterhead of Lundeen & Lundeen, attorneys at law, Minneapolis, Minnesota.

On August 24 Mrs. Nelson withdrew the $2,000 insurance money from the Vermillion bank, sending her check for that amount to Mr. Lundeen. On September 17 he again wrote her, saying amongst other things:

"I have looked over several propositions but have not as yet found one that I am satisfied with. I have a contract now that I am looking up that may be O. K. In the meantime the money is in one of the largest banks in the west drawing 2½% interest. *I ex-*

*pect to have it invested very shortly and I assure you that you need not worry about it in the least."* (Italics supplied.)

His next letter is dated November 29 and reads:

"The money reached me the 25th day of August, 1926. *I wanted to be careful in placing the money so took my time in looking around and it was not invested until the 30th day of September, 1926.* You will receive 6% interest payable monthly and after the first of the year $15.00 per month on the principal. This will net you monthly after the first of the year nearly $25.00 per month. The interest for October, November and December is $10.00 for each month." (Italics supplied.)

Pursuant thereto and with fair regularity until the latter part of 1930, he sent her payments varying from $10 to $50, so that by 1932 she had actually received from him $1,210. After 1930 the payments became progressively more irregular, and finally stopped. Her letters and telegrams went unanswered. In February, 1932, she wrote him demanding an answer to previously written letters; that he render an account of the invested funds; and that he give her the names and addresses of the parties to whom the money was lent. There was no reply. As a consequence Mrs. Nelson's peace of mind became so much disturbed that she made a trip to Minneapolis and there interviewed one of the assistant county attorneys and laid her complaint before him. Her testimony is that while there the attorney telephoned Mr. Lundeen and conversed with him. Pursuant thereto she immediately went to Mr. Lundeen's office. Then, for the first time, she was told that he had invested her money in mortgages on North Dakota and Montana lands. He explained that he did not have these in his office but promised to have them for her the next day. When she called he paid her $100 in cash and delivered to her five second mortgages upon lands in North Dakota and Montana. In addition thereto, he also gave her his own promissory notes, one for $100 and the other for $1,010, the two representing the balance of the money then computed to be due her out of the original investment. These notes have not been paid.

It is important to note that Mrs. Nelson did not become possessed of these alleged securities until approximately six years after the investment was supposed to have been made in her behalf. The notes, mortgages, and assignments are in evidence and are referred to as exhibits D-4, E-4, F-4, G-4, and H-4. All are second mortgages on lands in North Dakota and Montana. In every case the first mortgage had been foreclosed prior to their assignment. In four of them the time to redeem from the first mortgage foreclosures had expired, thereby eliminating the mortgages insofar as any security was concerned. As to the fifth mortgage, the time to redeem expired on September 30, 1926, which is the day on which respondent claims to have invested her money. Another item vitally important is the date of the assignments themselves. All are dated and acknowledged as of April 7, 1925, almost a year and a half before the date on which respondent claims to have purchased them. Every note and mortgage was in default from three and one-half to nearly seven years. The unpaid amount of the principal represented by these notes and mortgages was $2,046, of which $1,598 was in default at the time of the alleged sale thereof to Mrs. Nelson. There were no abstracts going with these papers; no investigation was made of the financial responsibility of the makers or inquiry made as to the real status of the respective loans. Yet respondent asserts that he made these investments for her in good faith and in the belief that her money was safe.

Four of these would-be securities bear interest at 12 per cent and one at 10 per cent after maturity. Yet respondent solemnly informed and promised her that she was to receive six per cent interest on her money payable monthly. There is nothing in these instruments, or anything else in writing for that matter, upon which to base such representation. All we have is Lundeen's *ex post facto* assertion that someone was to make such payments. His explanation is that the man from whom he purchased these mortgages had agreed to be personally responsible for them. This, according to his claim, is why the payments were to be met in the fashion provided in his letter to Mrs. Nelson. His testimony is that he believed he took a written agreement to this effect but has been unable

to locate it. He was unable to give the name of the man from whom he purchased the mortgages, although he testified having had frequent dealings with him from September, 1926, until the summer of 1932 with regard to these mortgages. When payments on the mortgages fell behind in the fall of 1930 he claims to have hounded the man continually for payment by means of telephone calls, personal calls, letters, etc., all through 1931. Yet he could not remember the man's name at the time of trial in 1935. Nor could his secretary recall the name of this man or anything else about him other than that he had a "Nordic" accent. His whole story looks fishy and untrue. Is there any probability that the mortgagors who had lost title to their lands upon which these second mortgages were given through foreclosure of the first mortgages would continue to pay interest and principal upon their second mortgages? No effort was made to produce any records either as to payments made upon the mortgages or the manner in which the payment for their purchase was made except that respondent claims that he paid $2,000 to this man, name unknown, in cash. He carried a checking account at that time but did not resort to that method so as to afford some reasonable proof of what he now claims. It is surprising, too, that this mysterious person so selling the mortgages and so guaranteeing their payment at no time (except once or twice) paid respondent anything thereon except *in cash*. There was no correspondence offered in evidence, by copies or otherwise, of what had taken place between this person and respondent. In explanation thereof it is claimed that this person came to respondent's office to make these monthly payments or sent his office girl to make them. Needless to say, this man has never been found by anyone nor was the name of his office girl mentioned or ever ascertained.

Without further detail, it seems obvious that respondent's story is so incredible, in fact so preposterous, that no court is warranted in believing a word of it. The conclusion that there was a misappropriation in fact is inescapable. The most charitable view anyone can take is that he, in taking over this money, intended to repay Mrs. Nelson in the manner which he outlined in his letter

but later found himself unable to do so. Thereupon, so it obviously appears to us, he attempted to deceive her by procuring and producing the five worthless promissory notes and second mortgages.

Respondent's own act, exhibit 63, in which he submitted to this court his "resignation" as an attorney at law, is in itself an admission of his unfitness to be an attorney and counsellor. Amongst other things he therein said: "Complaints have been filed against me by the Board of Law Examiners and I have not and do not now deny that in some matters I handled as an attorney I was negligent and careless." The instrument bears date November 19, 1935, and was addressed to the then chief justice of this court.

Of the other nine matters upon which testimony was taken and findings made, it is enough to say that as to one of them, the so-called Lindberg matter, the findings perhaps do not adequately establish the claims of the bar board. We conclude that the other eight are adequately established. While some of these are of minor importance, yet among them are several instances involving gross neglect of clients' affairs. We need make no further reference to these as they are but cumulative proof of respondent's unfitness to be a member of the bar.

Upon the facts so firmly and conclusively established nothing except an absolute disbarment can be permitted.

Judgment of disbarment will be entered forthwith.